**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Case No. 04-CR-104-TCK |
| | ) | (Civil Case 08-CV-390-TCK-TLW) |
| **LEE EDWARD ROBBINS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINION AND ORDER**

Before the Court are Defendant's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence ("§ 2255 Motion") and brief in support (Doc. 135); Defendant's affidavit in support of the § 2255 Motion ("Robbins Affidavit") (Doc. 136); the Government's response (Doc. 143); and Defendant's reply (Doc. 146).[1] Attached as exhibits to the Government's response brief are (1) an exhibit showing the number of trial transcript pages attributable to cross-examination of government witnesses; (2) the affidavit of Defendant's trial counsel, Michael McGuire ("McGuire") ("McGuire Affidavit"), and (3) the affidavit of Defendant's appellate counsel, Art Fleak ("Fleak") ("Fleak Affidavit").

**I.   Procedural History and Facts Relevant to § 2255 Motion[2]**

Defendant and his co-Defendant Gabriel Bonner ("Bonner") were charged in a 66-count Superseding Indictment. In Count 1, Defendant and Bonner were charged with conspiring to

---

[1] Defendant has been released since the filing of his § 2255 Motion, but this does not render the motion moot. *Prost v. Anderson*, 636 F.3d 578, 582 (10th Cir. 2011) ("[A] habeas petition challenging a conviction isn't mooted by a prisoner's release from incarceration because the Court is willing to presume that the fact of conviction has continuing collateral consequences.") (internal quotations omitted).

[2] A factual summary of the trial evidence is set forth in the Tenth Circuit's Order and Judgment ruling on Defendant's direct appeal. (*See* Doc. 134.)

commit tax fraud. In Counts 2-16, Defendant was charged with fifteen specific instances of aiding in the preparation of fraudulent tax returns. In Counts 17-66, Bonner was charged with fifty specific instances of aiding in the preparation of fraudulent tax returns. McGuire represented Defendant during a jury trial held July 18-29, 2005. Defendant did not testify, but Bonner did testify. The jury convicted Defendant of Counts 2-16, found Defendant not guilty of Count 1, and found Bonner not guilty of all charges.

According to Defendant's affidavit, Defendant was satisfied with McGuire's trial preparation, trial strategy, and his performance during the first two days of trial. Defendant contends, however, that McGuire ceased performing effectively on the third day of trial and essentially abandoned the defense strategy they had discussed. Defendant contends that McGuire's "entire demeanor and conduct of [his] defense abruptly changed." (Robbins Aff. ¶ 10.) Defendant attributes this change in performance to an alleged conversation between Defendant and McGuire on the morning of the third day of trial. Specifically, McGuire allegedly told Defendant "in private that he [McGuire] had not filed his tax returns for the past five years and that he felt that I [Defendant] should know this." (*Id.* ¶ 9.) Defendant contends that McGuire, following such disclosure, began to refer to the tax returns as "bogus" and "fraudulent" and "refused to call any of the fact witnesses or expert witnesses we had planned to call as part of my defense." (*Id.* ¶ 10.) Defendant contends that this change in behavior was driven by McGuire's fear of prosecution for tax evasion and that McGuire essentially "threw" Defendant's trial to curry favor with prosecutors and avoid his own prosecution. Defendant further contends that McGuire refused to allow Defendant to testify on his own behalf.

McGuire denies that such a conversation occurred and denies that his advocacy changed during trial. (*See* McGuire Aff. 14 ("This conversation never occurred . . . . I never discussed any specifics about my taxes with [Defendant before trial, during trial, or after trial. . . . [Defendant's testimony] that I disclosed to him during trial my personal tax information is false, never happened, and his further statement [that McGuire] 'was abandoning our planned defense strategy' is also false."). According to McGuire, Defendant "never complained to [him] that [he] had all of a sudden deserted him or changes the defense strategy" and that Defendant "was complimentary of [his] efforts the entire trial." (*Id.* 15.) McGuire further denies that he refused to allow Defendant to testify and argues that all challenged decisions – including the decision that Defendant would not testify – were made with the agreement of Defendant.

On August 12, 2005, McGuire filed a motion for new trial and motion for judgment of acquittal, arguing that the verdict was against the weight of the evidence and that the Court erred by denying the motion for severance. Such motion was denied by written order on September 27, 2005.

On December 5, 2005, prior to sentencing, McGuire moved to withdraw as counsel due to Defendant's non-payment of attorney's fees. During the sentencing hearing, the Court announced that McGuire would be permitted to withdraw as counsel for purposes of appeal. This was memorialized by Order dated January 18, 2006. The Court granted Defendant's motion to proceed in forma pauperis on appeal, and Fleak was appointed to represent Defendant on appeal.

Fleak raised four issues on direct appeal – denial of the motion for severance, adequacy of the verdict form, the calculation of tax loss for sentencing purposes, and the imposition of costs of prosecution. Fleak raised such issues after corresponding in great detail with Defendant and seeking

3

his input on all possible appellate issues. (*See* Fleak Aff. (quoting numerous letters between Defendant and Fleak).) Fleak did not pursue on appeal all issues raised by Defendant. Instead, Fleak selected those issues he "felt had some chance of merit." (*Id.* at 11.) The Tenth Circuit rejected all appellate arguments and affirmed the jury's verdict against Defendant.

Defendant timely filed a § 2255 Motion, raising the four following claims of ineffective assistance of counsel: (1) McGuire was ineffective because he had an undisclosed conflict of interest that impacted his performance at trial; (2) McGuire was ineffective because he refused to allow Defendant to testify; (3) McGuire was ineffective because he abandoned the defense strategy and began using "condemning terms and prosecutorial phrases" to describe Defendant's conduct; and (4) Fleak was ineffective for failing to raise any of the above three issues on appeal.

## II.   Ineffective Assistance Claims Against McGuire

"To succeed on an ineffective assistance of counsel claim under § 2255, a defendant has the twofold burden of establishing that (1) defense counsel's performance was deficient, i.e., counsel's 'representation fell below an objective standard of reasonableness' as measured by 'prevailing professional norms,' and (2) defendant was prejudiced thereby, i.e., 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *United States v. Rushin*, 642 F.3d 1299, 1302 (10th Cir. 2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).[3]

---

[3] The Court has applied the *Strickland* standard to all of Parts III and IV, except Part III.C addressing McGuire's alleged conflict of interest.

4

### A. Refusal to Allow Defendant to Testify

"A criminal defendant has a constitutional right to testify in his own behalf at trial." *Cannon v. Mullin*, 383 F.3d 1152, 1171 (10th Cir. 2004). The decision whether to testify lies squarely with the defendant. *See id.* "Defense counsel should inform the defendant that he has the right to testify and that the decision whether to testify belongs solely to him." *Id.* "Counsel should also discuss with the defendant the strategic implications of choosing whether to testify, and should make a recommendation to the defendant." *Id.* Counsel lacks authority to prevent a defendant from testifying in his own defense, even when doing so is suicidal trial strategy." *Id.* Deprivation of the right to testify automatically satisfies the first *Strickland* prong of deficient performance. *See id.*

McGuire has offered a detailed affidavit explaining Defendant's decision not to testify:

> [Defendant] agreed with my recommendation not to testify after the Government completed its case. After our discussion about whether he should testify or not, it was our joint decision he would not testify because of how the trial had gone so far, the danger of impeachment evidence, and [Defendant] being asked to justify large amounts of small business deductions on returns that all the filers claimed were not legal.

(McGuire Aff. 11.) Defendant contends, in contrast, that he "very much wanted to testify [on his] own behalf" but that McGuire "threatened to withdraw as [his attorney] and told [him] that [McGuire] had already told the court that [he] would not take the stand." (Robbins Aff. ¶ 12.) For purposes of this motion, the Court assumes without deciding that Defendant could establish at an evidentiary hearing that McGuire somehow "prevented" Defendant from testifying and that McGuire's performance was therefore deficient.[4]

---

[4] The Tenth Circuit has held that "general and ambiguous affidavits" alleging that counsel prevented a defendant from testifying do not merit a § 2255 evidentiary hearing, *see United States v. Bailey*, 245 Fed. Appx. 768, 770 (10th Cir. 2007), and that "a defendant must assert more than the bare conclusion that counsel 'refused to let' the defendant testify," *see United States v. Meacham*,

In order to establish prejudice from a failure to testify, a defendant must show that "there is a reasonable probability that defendant's testimony would have raised in a juror's mind a reasonable doubt concerning his guilt." *Cannon*, 383 F.3d at 1171. Having reviewed the transcripts and presided over this trial, the Court finds no reasonable probability that Defendant's testimony, presumably denying that he prepared fraudulent returns, would have raised any doubt in the jurors' minds, due to the overwhelming evidence of guilt presented by the United States.

As summarized by the Tenth Circuit's decision on appeal, the evidence at trial established that Robbins & Associates ("R&A") "was a bookkeeping and tax return preparation business which helped clients minimize their tax payments and maximize their refunds by falsely characterizing nondeductible personal expenses as deductible business expenses." (Doc. 134 at 2.) More specifically, Defendant developed and implemented a business model that advertised and encouraged clients to sign up for an Individual Revenue Strategic Plan ("IRSP"), which cost $350 for a married couple, $175 for an individual, and $100/month thereafter.[5] Under this plan, customers

---

567 F.3d 1184, 1188 (10th Cir. 2009). However, the Tenth Circuit has held that an evidentiary hearing was required where the defendant submitted a detailed affidavit alleging that "he had begun to take the stand when trial counsel quickly sprang out of the chair and said that the defense rests in order to cut the defendant off." *See Cannon*, 383 F.3d at 1171. Here, Defendant's affidavit is not wholly conclusory because he alleges how and at what point during trial he told McGuire he wished to take the stand and alleges that McGuire threatened to withdraw if he did so. At the same time, Defendant's affidavit is not as specific as that discussed in *Cannon*. The Court does not hold that an evidentiary hearing is warranted under these circumstances but simply assumes that Defendant could establish his version of events.

[5] A former employee of Robins & Associates, Bronwyn Scott ("Scott"), testified that Defendant showed her a computer presentation of the IRSP, which provided:

> Turn current personal expenses into legal business deductions. Deduct your mortgage or rent, utilities and insurance. Mileage from your home to work (round trip) becomes 100 percent deductible at 31 cents per mile. Trips that used to be vacations can become 100 percent deductible. Create additional $4,300 deduction

were instructed to establish a home based business known as an "accounting referral business," and R&A would pay clients for recruiting new customers to R&A. In most cases, however, the clients held full time employment outside the home and spent very little time referring clients to R&A. R&A would receive bank statements and cancelled checks from its IRSP customers and file tax returns on their behalf. R&A also prepared tax returns for individuals with a valid business. For these clients, R&A prepared returns that understated gross receipts and overstated deductions. The United States presented twenty-five R&A customers who testified that their tax returns reflected either phony or inflated business expenses.

In light of this overwhelming evidence of fraudulent returns, the question was essentially whether Defendant and/or Bonner was responsible for the preparation of such returns. The jury found that Defendant alone was responsible. This was supported by the evidence, which established that (1) Defendant was the principal of R&A; (2) Defendant developed IRSP and other models that resulted in the fraudulent returns; (3) Defendant recruited, hired, and trained Bonner to work in R&A's Tulsa office while he worked in the Georgia office; (4) Defendant reviewed Bonner's work; and (5) Defendant, and not Bonner, e-filed all returns for which he was convicted.

Considering the above evidence, Defendant cannot show that there is a reasonable probability that his testimony would have raised in a juror's mind a reasonable doubt concerning his guilt. Defendant contends that his testimony would have (1) refuted Bonner's testimony; and (2) addressed Government's Exhibit 84. First, although Defendant could have attempted to refute the

---

per dependent child. Medical, dental and optical expenses become 100 percent deductible. Follow the 'quick-start' program that's ready to implement. How to become audit proof! Much, much more.

(Trial Tr. 126-27.)

testimony of Bonner minimizing Bonner's role, Defendant could not have effectively eliminated his own role in the preparation. Defendant developed the business, trained Bonner, and filed the relevant returns. This is not a case where Defendant's testimony "pointing the finger" at Bonner had a reasonable probability of eliminating Defendant's own guilt. In any event, such testimony would have been subject to insurmountable impeachment by the testimony of several clients who had previously testified at trial.

Second, Defendant contends that he would have further explained Government's Exhibit 84, which was a document list of "Tax Deductible Expenses" discussed during the direct examination of Scott. Defendant alleges that Scott had "whited out" Exhibit 84 to remove certain of Defendant's hand-written notations. Defendant claims that these alleged notations "were written at [Defendant's] direction next to various items with a reference to the words "Non Deductible Expenses." (Robbins Aff. ¶ 13.)

This argument is unavailing. McGuire thoroughly explored the "white out" issue on cross-examination, and Scott explained that the information "whited out" was simply a phone number she had written on the document. The Court commented during trial that Scott sufficiently explained the "white out" issue to the jury three times and cautioned McGuire to proceed to another line of questioning. Apparently, Defendant wished to testify that there was some other writing, in addition to the phone number, that Scott whited out before sending the document to prosecutors. However, the Court finds it highly unlikely that a jury would have given any weight to Defendant's testimony that he "referenced" certain items as non-deductible on his own list of "tax deductible expenses" but that Scott whited out all such notations. Further, any such testimony would have been outweighed

8

by the actual practices described by Defendant's customers. As during trial, the Court continues to find the "white out" issue to be of little consequence to the jury's consideration of Exhibit 84.

McGuire described the reasons Defendant did not testify:

> Our biggest problem was the information on the returns and how it got there. [Defendant] would have had to claim all the deductions and home businesses set up by himself and Bonner were all factual and legitimate. To put [Defendant] in the cauldron of cross-examination after hearing so many of the filers claimed the returns were based on false information would have asked Robbins to affirm his work on the returns, which would have proven the charges against him.

(McGuire Aff. 12-13.) The Court agrees with this assessment and believes that Defendant testifying would have been devastating to his case, rather than in any way helpful. The Court therefore concludes that there is no reasonable probability that, but for McGuire's alleged refusal to permit Defendant to testify, the result of the proceeding would have been different. The Court further finds that Defendant taking the stand would have subjected him to impeachment by numerous other trial witnesses and potentially harmed his defense. *See generally United States v. Gormley*, No. 3:03-0340, 2006 WL 5811898, at *5 (S.D.W.Va. June 27, 2006) (finding no prejudice resulting from failure to testify where, considering all trial evidence, the defendant's "reasons for [desiring to testify] appear feeble when contrasted with the very real potential for harm to his defense from taking the stand").

### B. Use of "Condemning" Statements During Closing Arguments

Defendant complains that McGuire used certain phrases, particularly during his closing argument, that implied Defendant's guilt. For example, McGuire said that "[t]here is no doubt the returns are wrong," (*see* Closing Argument Tr. at 21), and described the returns as "apparently fraudulent," (*see* id. at 24). In his affidavit, McGuire explained the reason he made this concession to the jury:

9

> My biggest concern was being placed in a position to argue the returns were accurate and truthful . . . . [P]roving the information in the returns to be factual was next to impossible. We couldn't do it. Once the government's witnesses testified that the returns were bogus and not truthful, it seemed to me the best thing to do was to adopt the evidence and make it our own . . . . Following this, we could use the government witnesses to argue the lack of evidence of intent, the lack of credibility of the filers, and we did not have to try to argue the returns and deductions claimed in them were legal.

(McGuire Aff. 19.) Thus, McGuire's description of the returns as fraudulent was a strategic decision made by counsel.

In order for a strategic decision to rise to the level of constitutional ineffectiveness, the decision must have been completely unreasonable, so that it bears no relationship to a possible defense strategy. *See Romano v. Gibson*, 278 F.3d 1145, 1153 (10th Cir. 2002). For the reasons aptly explained by McGuire, conceding this element of the crime was a reasonable trial strategy in light of the overwhelming evidence that the relevant returns involved fictitious businesses and overstated expenses. At an absolute minimum, such decision bears a relationship to a possible defense strategy. The decision does not, as Defendant argues, evidence that McGuire had somehow abandoned Defendant and decided to sabotage the defense. Therefore, Defendant cannot show that McGuire's performance was deficient and cannot satisfy the first *Strickland* prong.

### C. Conflict of Interest

Defendant further alleged ineffective assistance based on McGuire's conflict of interest – namely, McGuire's alleged failure to file his own tax returns. In the specific section of his brief alleging a conflict of interest, Defendant cited the case of *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980). *Cuyler* provides a more lenient standard than *Strickland* because it does not require a showing of prejudice. *See United States v. Ohiri*, 287 Fed. Appx. 32, 38 n.5 (10th Cir. 2008) (comparing different standards and indicating that a defendant claiming ineffective assistance based

on conflict of interest could potentially proceed under either *Strickland* or *Cuyler*). The Court therefore construes this ineffective assistance claim as made pursuant to *Cuyler* and will apply the *Cuyler* standard.

Where, as here, a defendant did not raise the alleged conflict at trial, a defendant must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. *See United States v. Bowie*, 892 F.2d 1494, 1500 (10th Cir. 1990) (citing *Cuyler*). "An actual conflict of interest results if counsel was forced to make choices advancing other interests to the detriment of his client." *United States v. Alvarez*, 137 F.3d 1249, 1252 (10th Cir. 1998). In order to demonstrate an actual conflict of interest, a defendant "must be able to point to specific instances in the record which suggest an impairment or compromise of [the defendant's] interests for the benefit of another party." *Id.* (internal quotations omitted). If a defendant makes this showing, prejudice is presumed. *See id.* (citing *Cuyler*).

McGuire denies any wrongdoing. However, assuming for purposes of this motion that (1) McGuire engaged in tax evasion, and (2) this created a potential conflict of interest,[6] Defendant has pointed to nothing in the record suggesting that such conflict adversely affected Defendant in any way. In other words, Defendant has not shown that McGuire impaired or compromised Defendant's interests for his own benefit as a result of the alleged conflict. Defendant cited to the same "condemning" statements discussed above in Part II.B. However, these statements were part of a

---

[6] It is questionable whether Defendant's alleged facts give rise to even a potential conflict of interest. *See United States v. Jones*, 208 F. Supp. 2d 929, 934 (N.D. Ill. 2002) (defendant convicted of filing false returns alleged conflict of interest because his counsel was being investigated by IRS for owing back taxes) ("Moreover, [the defendant] offers no legal basis, nor am I aware of any, for a conflict of interest in a tax evasion case where defendant's counsel owes back taxes.").

sound trial strategy conceding one element of the crime. McGuire did not, as alleged by Defendant, abandon the defense. McGuire developed a strategy he deemed most effective in light of the prosecution's evidence. The Court saw no indication that McGuire ceased to advocate for Defendant midway through the trial. Therefore, Defendant has failed to demonstrate an actual conflict of interest that adversely affected McGuire's performance.

### III. Ineffective Assistance Claims Against Fleak

Defendant claims that Fleak was ineffective because he did not pursue on appeal the three issues discussed in Part II.A-C – namely, McGuire's refusal to allow Defendant to testify, use of certain condemning statements, and conflict of interest. When a habeas petitioner alleges that his appellate counsel rendered ineffective assistance by failing to raise an issue on direct appeal, the Court first examines the merits of the omitted issue. *Hawkins v. Hannigan*, 185 F.3d 1146, 1152 (10th Cir. 1999). If the omitted issue is meritless, then counsel's failure to raise it does not amount to constitutionally ineffective assistance. *Id.*; *see also Parker v. Champion*, 148 F .3d 1219, 1221 (10th Cir. 1998) (citing *United States v. Cook*, 45 F.3d 388, 392-93 (10th Cir. 1995)). If the issue has merit, the Court then must determine whether counsel's failure to raise the claim on direct appeal was deficient and prejudicial. *Hawkins*, 185 F.3d at 1152; *see also Cook*, 45 F.3d at 394. The relevant questions for assessing Defendant's claim of ineffective assistance of appellate counsel are whether appellate counsel was "objectively unreasonable" in failing to raise the omitted claims on appeal and, if so, whether there is a "reasonable probability that, but for his counsel's unreasonable failure" to raise the claims, Defendant "would have prevailed on his appeal." *Neill v. Gibson*, 278 F.3d 1044, 1057 (10th Cir. 2001) (citing *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000) (applying *Strickland*, 466 U.S. at 687-91)).

The Court concludes that Fleak was not deficient in failing to raise McGuire's alleged conflict or ineffective assistance on direct appeal because such claims may not be pursued on direct appeal. *See United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995) (explaining that claims of ineffective assistance of counsel are "presumptively dismissable" and that "virtually all will be dismissed"); *United States v. Gonzalez*, 238 Fed. Appx. 350, 354 (10th Cir. 2007) (new appellate counsel raised on direct appeal whether trial counsel's performance fell below objectively reasonable standard) (explaining *Galloway*'s holding that ineffective assistance claims must ordinarily be brought in collateral proceedings and holding that the defendant "failed to rebut the exceedingly strong presumption against the immediate consideration of his ineffective assistance claim"). Given this Tenth Circuit law, an objectively reasonable appellate counsel could elect not to pursue an ineffective assistance claim on direct appeal.

### IV. Certificate of Appealabilty

Rule 11 of the *Rules Governing Section 2255 Cases in the United States District Courts* instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Pursuant to 28 U.S.C. § 2253, the court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court "indicates which specific issue or issues satisfy [that] showing." A petitioner can satisfy that standard by demonstrating that the issues raised are debatable among jurists, that a court could resolve the issues differently, or that the questions deserve further proceedings. *Slack v. McDaniel*, 529 U.S. 473 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)). In addition, when the Court's ruling is based on procedural grounds, a petitioner must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim

of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

In this case, the Court concludes that a certificate of appealability should not issue. Nothing suggests that the Court's ruling is debatable or incorrect. The record is devoid of any authority suggesting that the Tenth Circuit Court of Appeals would resolve the issues in this case differently. A certificate of appealability shall be denied.

## V. Conclusion

Defendant's § 2255 Motion (Doc. 135) is DENIED. A separate judgment will be entered.

**DATED THIS 24th day of August, 2011.**

_____
**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**